Good morning Judge Rodner. Good morning Judge Rodner. Good morning everyone. First case this morning is Mountain Crest v. Anheuser-Busch. Mr. Benoit. Good morning Your Honors. My name is Charles Benoit. I'm counsel for the plaintiff appellant Mountain Crest. It cannot possibly be in that with the act of state doctrine that a party receives immunity from U.S. statutory law whenever they negotiate a contract with a foreign government. But that's what my friends are arguing here today. They distinguish... May I interrupt to ask sort of a bottom-line question that I really have been thinking about quite a bit. How would we resolve this case in your favor or at all really without a pining on the validity of the 2000 and 2015 agreements which you concede are official acts of the Ontario Provisional Government? Thank you for that question. It definitely gets right to the heart of this case and the answer is that when the validity when Supreme Court used validity in Kirkpatrick and in previous cases they're talking about legally operative. So we are absent no matter what the 2015 contract will be held to be legally operative. That is what the act of state doctrine commands. It is the act of state doctrine prohibits this court or any U.S. court from declaring the 2015 contract null and void. One of our pieces of equitable relief did seek to give effects to the contract which is the contract happens to have termination provisions. It was tailored to the relief of that contract so you can't say if something's being declared null and void if it's if we're only looking to give effect to provisions that exist within the contract. But that's only one piece of equitable relief. Under common grounds there'd be reasons for not doing that and that would be in a district court's decision. But to get to your point about not having to declare the 2015 contract invalid, what we're only asking here is did the private parties, the defendants in this case, violate statutory duties when they went about procuring the contract? And that's the exact same thing that happened in Kirkpatrick. But how could you prove money damages from the two agreements without demonstrating that the agreements themselves violated the Sherman Act? So that exact question was asked in Kirkpatrick. The Solicitor General in his brief said that that's not an issue because the government of Nigeria wasn't named. So there was no cause to determine whether they had any liability. When an official government or government instrument isn't being named then there's not a question of their liability before the case. In Kirkpatrick the plaintiff stated that their damage was from denial of their competitive opportunity. That was an even more stark case. In our case we've got the other aspects of the antitrust conspiracy and the out of stocking and the shenanigans at the beer store. But in Kirkpatrick that was it. Their only damage was from the sovereign decision of Nigeria to forego giving Kirkpatrick, sorry, the TTC, that plaintiff's damage was entirely from Nigeria's sovereign decision to give its contract to its competitor. But so the damages don't flow from the contract. The damages flow from the violation of statutory duty. Well, you know, the bribe that was alleged in Kirkpatrick was a discreet incident of wrongdoing by the defendants for purposes of assessing damages. Is there similar identifiable wrongdoing by the defendants here that is distinct and separate from the act of entering into the agreements themselves? So I'm so glad you asked this and this is key. We really need to dwell on this point. We're perfectly aligned here. So there's two answers to your question. A factual and a legal one. So factually, that's actually not correct about the bribe in Kirkpatrick. You can imagine a bribe that's totally separate from the terms of a contract, right? Like a contract that's just clean on its face and then maybe two low-level agents somewhere, you know, there's a suitcase of cash that just push the contract over the table. That's actually not the bribe in Kirkpatrick. The bribe in Kirkpatrick was built into the contract. Kirkpatrick didn't have the money to pay the bribe up front. So with the help of a London solicitor, they actually baked in this 20% commission directly into the contract. So the bribe was paid with the contract's own funds. And there was a cover story for it. So they set up two corporations, Derrick's and Lowe's, and one corporation was supposed to help with market research in West Africa. So it actually wasn't a discrete separate thing, the bribe in Kirkpatrick. The bribe was part of the contract. And now to the other half of your question, what you're suggesting, though, is if that's right, if a term...so in our case, the restraints on the LCBO's beer buying ability are right there in the contract. And that's what you're suggesting. So you're suggesting, from my opening line, that a contractual term in a government contract earns the private party immunity from U.S. statutory laws? That can't be so. I can give you a personal anecdote. Earlier in my career, I worked at General Electric. I'm in the D.C. office and in-house counsel, which I was part of. One of the main things we did was the worrying about the Export Administration Act. That act, there's a whole office, the Office of Anti-Boycott Compliance in the Bureau of Industry Security at the Department of Commerce. And what they do is, because of the anti-boycott laws passed in 1977, it's illegal, it's a breach of statutory duty for any U.S. business to agree to a contract that requires any kind of boycott of Israel. So the Arab League back then, they had boycotted companies. And when I was with GE, that was something, you'd still find it. It would still pop up. It was pro forma in contracts that you shall not do business with these following Israeli companies. And it never occurred to us that, and this seems insane, that we could say, oh, well, it's a government contract, so we have immunity from U.S. statutory law. Because if you found that we breached a duty, then this contract would be invalid, and the active state doctrine, therefore, gives us immunity. It's not so. The active state doctrine just means that that contract will have the legal effect it does, and that's even how it works in the anti-boycott laws, but you still go for the penalties. Let's get back to your case for a moment, sir, and talk about a very fundamental point, but one that certainly perplexes me after reading the pleadings in the case. What precisely is the anti-competitive behavior of which you are complaining? Sure. It's the restraining the beer export trade to Ontario. That's a bottom line. What acts did the defendants do that were anti-competitive to achieve that end? If I could point you to one exhibit, it would be Exhibit 29. You've got proof of a horizontal conspiracy. That's when two manufacturers and the two largest brewers coming together, conspiring, and Exhibit 29 is a memo of their trade association, and they're saying, we can't let the LCBO place against each other. When they say place against each other, they mean the free market. We have to be lockstep, and they're literally naming off their competitors' beers and saying, we just want you to stop carrying this and stop carrying that. So the anti-competitive activity is through the working of the trade association and the beer store? Through the general activity, day-to-day activity of those entities? There's a lot of antitrust schemes. There's a lot of legs to it. That's what we've been trying to sort out here. Tell us about the legs. Sure. Leg number one, restraining the LCBO's beer buying ability. It might sound odd if you're not more familiar with the beer buying landscape in Ontario, but there's actually comparatively very few beer retail outlet locations, like a tenth of it, and so the result is the majority of beers bought in large format. So restraining the LCBO's beer buying ability is one leg. They did that. It's just not competitive. The LCBO is not allowed to match them in discount pricing. They've made the LCBO not an effective beer retailer, especially in the value beer segment. And then the next is the marketing schemes, the out-of-stocking conspiracy, everything they do at the beer store. So even my client made the regrettable mistake of taking them up on attempting to enter this market, even after the LCBO had been taken off the table, they go and try to sell in the beer store, and they're met with the other prong of the scheme. It's very clear the Sherman Act was intended to protect U.S. exporters. When Congress passed the Foreign Trade Antitrust Improvement Act, they directly contemplated this, and they were worried about... U.S. exporters were complaining. They were saying, you know, the antitrust laws actually inhibit us a lot from growing our export markets. And so Congress went to the extraordinary length of saying, okay, well, if you want to form an export cartel, we'll do it, but there's rules. You have to do all these filings with the Department of Commerce. And so that, too, was flouted. So that's an entire statute that is just being ignored. But I also want to... Forgive me for breaking in. You claim the defendants, CEOs, and boards of directors were involved in a scheme to pay the LCBO cash in exchange for the LCBO's commitment to discontinue purchasing larger boxes of imported beer. Did you specifically allege in your complaint that it was the American CEOs and directors engaging in that scheme, that alleged scheme? So it was... In the late 90s, it was the... We have evidence-proof documents from their own trade association where they specifically mention that the presidents of the major shareholders, that's the defendants, were directly involved. That was... At that time, it was the defendants' predecessor companies, Interbrew SA and Molson Inc. But one point I want to quickly make, though, just because as we're having this discussion, I think it's really important, and Professor Harrison makes this argument in his wonderful law review article, that we need to be clear about when we're talking about Sherman Act and act-of-state doctrine. So the act-of-state doctrine is a rule of decision. But I have a very particular question, and it is, did you specifically allege in your complaint that it was the American CEOs and directors engaging in this scheme? Yes, we did. Yes, ma'am. And where? So we named them. We named the current CEOs of both the defendants, Sir Carlos Broody and Mark... Molson Corp's CEO, Mark Hunter. Sorry, I'm just drawing a blank on that one. And throughout the 2000s, we actually introduced an exhibit attached to our plaintiff's brief response. He personally took Molson Corp's investors on a tour of the beer store. We... So yes, we've named... And we named as well the... For ABI, up until 2004 and 2005, thereabouts, it's the President of the Americas. And then after IMBEV acquires Anheuser-Busch, it becomes the North America region. And then finally, there's the ABI Business Unit President of Canada. But we've named all the individuals that are... Directly furthered this conspiracy that we allege. Does that answer your question? Oh, I'm not... Sorry, I'm not hearing. Got to go back and read again. I do. I would love to... I just want to make sure our conversations about Sherman Act and Act of State Doctrine are segued, because it's really... There's not variations of the Act of State Doctrine depending on what the nature of the case. There's one Act of State Doctrine that means that government contracts have to be deemed legally operative and given the effect they're supported to have. If it's all right with the court, I'd like to reserve the remainder of my time for rebuttal. I have a quick question, if you don't mind, because you sort of just brought it up. What difference does it make to the Act of State Doctrine analysis whether or not we consider the four agreements preventing the LCBO from selling 12 or 24 PACs and offering PAC up-pricing to be We're not resting on the commercial exception. We don't need it. We can accept them all as valid. None of the four acts are being declared null and void. We're not seeking any kind of declaratory relief that would seek to deny them legal effect. So we're happy to accept that they're all official acts. You have to acknowledge, I guess, that injunctive relief at least would be barred. By the Act of State Doctrine, right? Well, not injunctive relief in terms of them going, defendants going to get the appropriate certificates, for example, under the, from the Department of Commerce. That, and no one said explained how that would be. The district court didn't do it. The defendants haven't done it. Or for our monetary damages. Now, if you take the view that when we ask them to terminate the 2015 contract, then that denies legal effect even though it's pursuant to the contracts on terms, then yes, then that would deny that one injunctive relief. But that's not a bar to the case proceeding. And again, in Kirkpatrick, no one said we're going to have to cancel the governor of Nigeria's contract with Kirkpatrick. That contract was not. It was, it was held, it went along while at the same time statutory duties were applied. Well, realistically, what relief would be available to you, you know, without calling into question Ontario's governmental policies preventing the LCBO from selling larger amounts of beer? Well, number one, our monetary relief. My client's a business. It was, you know, hounded out of the exporting to Ontario. I'd like to re-enter, especially now with the new government of Ontario finally liberalizing the beer landscape, which, you know, can't help but say we actually really care a lot less about that injunctive relief given that, you know, the changes in the landscape there. So the monetary relief would be extremely helpful in restoring the export competition in beer to Ontario. And that would absolutely ameliorate my client's situation. Thank you very much. Thank you. You might have to hire it. Good morning, Your Honours. May it please the Court. My name is Steve Sunshine. I am counsel for the Appalese, Anheuser-Busch InBev, and Molson Corps. And I want to start really right with the questions that the Court asked my colleague at the bar about the nature of the relief that can be provided by this Court and the conduct that's actually alleged to be illegal and the sources of that conduct. I think it's important to start out to recognize that the only issue presented to the Court below and upon which the motion to dismiss was decided was about the package sizes and the agreement by the LCBO, a Canadian and Ontario authority, not to sell certain package sizes in its own stores. That's the gravamen of the way that the case was litigated below. Again, I think it's worth emphasizing. It's an agreement by the authority in Ontario about what particular package sizes it would sell. It's not that the appellant here can't sell its beer. It just has to sell six packs like everybody else. And the District Court understood that to be the limitation. I would refer, Your Honours, to page 10 of the opinion footnotes. And taking that analysis and moving it back just generally into the Kirkpatrick analysis, Kirkpatrick of the Supreme Court teaches us that conducts of a sovereign within its borders is presumed valid. Now, there's two elements, the official acts and then the separate element about relief and defenses interposed. The official acts is conceded, so I think we've established that. But just before leaving it, I think it's instructive to understand that this six-pack rule is not a little standalone provision. It's part of an elaborate, complex framework for how the government of Ontario has chosen to distribute beer, going back to Prohibition. Now, I took your opponent to suggest that the conspiracy was somewhat broader and indeed involved acts antecedent to the arrangement with the government that ended up with the so-called six-pack rule. As I understand you now, you disagree with that and believe that the only thing that really is the agreement itself, the six-pack agreement. Your Honor, I basically disagree with that comment, but I'll characterize it this way because I think it's a little bit more complex. Certainly, the matter below was conduct about the six-pack rule that came out of the formation agreement. There are allegations in the complaint about the years of negotiation process leading up to that agreement. There are sites to exhibits of the CEOs of affiliates of the Appleys jointly discussing what their negotiation policy was in this back and forth. That's why this idea of the framework being understood as an omnibus distribution is so important. The framework agreement carries a lot of other obligations, including which BRI, the beer agreement, has to invest $100 million into distribution. This is a comprehensive framework. All of those discussions were part of the back and forth in the negotiation. If this were a U.S. law case, we would say all of that conduct is protected by the North Pennington Doctrine because you can jointly petition the government to take an action. Two competitors can say, we don't like the third competitor, but if they go and honestly petition the government for a governmental action that says exclude the third competitor, that's immune under our laws. So that conduct, Your Honor, is all in the lead up to the formation agreement. But all of the operative effects that are being complained about, certainly with respect to the case below and the grabbing of the complaint, arise out of the formation. Since we're taking this whole thing really in slivers as the way it's been presented procedurally, and we don't have the North Pennington issue before us, it appears to me that what the appellant is arguing is that there was a greater conspiracy by two American corporations to set up a situation in Canada from which they would profit to the exclusion of all other American competition. That being a conspiracy quite independent from the actual official product that came out of that when the arrangement was put in place. And is that a fair characterization of the case as it comes to us now? Well, Your Honor, I think those are arguments that certainly appellant is making before this court in its briefs and in the oral argument. I think those arguments aren't proper because of the posture of this case. But having said that, I'll address them. Those set of arguments, and I'll put the out-of-stocking scheme because that's something entirely separate and new, but those arguments about inducement of the government of entering into this anti-competitive agreement in appellant's views, the formation agreement, all of the buildup is exactly what some of the case law, Seabreeze Salt, Hunt Brothers, says that when the government forms an action, that's an intervening event, an interceding action, and it is not for a U.S. court to try to determine the motivations of the foreign sovereign, of the justifications. That's part of the political process. In Seabreeze Salt, the question was why did the Mexican government provide an exclusive arrangement to one Japanese company? The court said that's beyond the reach under the act of state. In the Hunt Brothers case, it was a question about did the defendants conspire to induce the Libyan government to seize plaintiff's assets? Factually similar, I would say, to the argument appellant is making. And the court said under the act of state doctrine, it's not for us to get involved in that kind of action. And I would distinguish, your honor, if the allegations of the conspiracy are what actually gets incorporated into the formation agreement, then I think that doctrine applies and all of that shouldn't be wrong. If there's some other conspiracy that's not the formation agreement, that's outside the formation agreement, then I think that's a separate claim that has to be evaluated under all of our rules. And just because it does show up in the briefing to this court, although it was not argued below, was the so-called out-of-stocking scheme that the BRI allegedly did to disadvantage Mountain Crest Beer. Now again, I think that that's not properly before this court. But even having said that, this plaintiff has had three bites at the apple to plead the complaint. In the out-of-stocking scheme, there's so many different elements of why that claim is defective. One, the BRI is a retail establishment formed under Canadian law. The way it distributes beer, the BRI is a government store, a retail cooperative formed under the Whole Liquor Control Act, and it has an agreement with the LCBO. So the buy and sell in the out-of-stocking is between the LCBO on one hand and the BRI on the other hand. So. I'd like to go back a little bit. The active state doctrine simply requires us to respect foreign sovereign acts as legally effective while we decide the merits of the case. Why would it be impossible for us to honor the validity of the Ontario government's policy regarding size restrictions on beer sales at the LCBO while considering Mountain Bush and Molson Coors violated the Sherman Act by directing their Canadian subsidiaries to pursue these policies? Your Honor, we do think that the active state doctrine covers precisely that conduct. And the reason why is Kirkpatrick says that acts of the foreign government are to be considered valid and effective. The act of the foreign government, which is also the act that gives rise to the antitrust liability, is an agreement. In order to have a Section 1 conspiracy, you need two parties. You need to have the LCBO on one hand and the BRI or the appellants on the other side. So to grant any relief to plaintiff on this argument, there has to be a judicial finding that the formation agreement is a violation of Section 1. Because there's no liability without it. I'll get to the relief in a section. But that goes right to what Seabreeze Salt would say, a determination that the contract that the government entered into inside of its own borders for conduct inside of its own borders would be a demeaning affront to that foreign sovereign. I think the questions Your Honor was also asking earlier about relief, I think the relief questions show exactly the same fatal problems under the act of state. First of all, the immediate relief or the real relief is what package sizes are being sold in the LCBO's own stores. So just when that kind of essence of the liability is understood, the idea of shaping any relief around that action shows that this is precisely a sovereign act under a sovereign stream. Let me just ask you if you admit that the four agreements that ultimately prevent the LCBO from selling beer in 12 or 24 packs or offering any promotional pack-up pricing, do they violate the Sherman Act? No, Your Honor, they don't. They don't violate it. First and foremost, they don't violate it under the act of state doctrine. The 2015 agreement, the counterparty to that is Her Majesty the Queen and Right of Ontario. And so to say that the provincial government and the whole government of Her Majesty violated the Sherman Act, I think is obviously not correct. And this idea about the sovereign, and this is the province of Ontario deciding how beer will be sold inside of its own borders, that's steeped with a number of social and state issues about taxing, about social responsibility, about employment, about investment, and that's peculiarly within the province's right to decide how it wants to affect those policies. Is the January 2015 plan offering a new share class in BRI for Ontario brewers and allowing those free listings in BRI stores for those brewers, is that still in effect? Your Honor, I believe it is. I don't think there's any evidence in the record to that effect. I don't know for sure. The 2015 agreement, besides validating all of the past conduct, which went back to 2000 and actually decades earlier, also changed the ownership. I believe that there are four government appointees that serve on the board of directors of BRI. This is in the 2015 framework agreement. And I wanted to go back a bit to the argument that appellants made about Kirkpatrick, about it's possible to have active state and to still enforce statutory duties against the defendants or the appellees in this case. And if you take that point to its logical extreme, you will have written the active state doctrine out of our jurisprudence and basically turned it back into sovereign immunity. Yes, the province of Ontario can't be sold. And if that's the case, then every lower court decision that has applied the active state doctrine to excuse private parties is wrongly decided. And I think that's very clear and very different if comparing what happened in Kirkpatrick with what happened in Seabreeze Salt. Kirkpatrick, there was a bribe, and the idea was the bribe was illegal under U.S. law, but the underlying merits of the Nigerian contract were not touched, were not contested. Here, it's the very essence of the formation agreement that's under attack. And that puts this case on all fours with Seabreeze Salt, with the Hunt brothers, with Spectrum stores. You know, you suggest that Mountain Crest's complaint could be dismissed on the grounds that Anhauser-Busch and Molson Coors' Canadian subsidiaries, not the defendants, are responsible for any allegedly anti-competitive decisions. But Mountain Crest has alleged otherwise, has it not? Mountain Crest has alleged otherwise, Your Honor. I believe those allegations are deficient. The grounds that we moved to the lower court, and I think we had it at the very end of our brief here briefly, was that the parent entities, Anhauser-Busch, InBev, and Molson Coors, are independent juridical entities, and there's no reason whatsoever to pierce the corporate bail. To reach very far downstream. In saying that, Your Honor, in no way do we think there's liability for the Canadian affiliates. But just clearly, the parent companies who had no involvement in this conduct  have no liability for this. Your Honors, I have no further points. Of course, I'd be happy to respond to any questions that you may have. Thank you, Counselor. Thank you. Counsel, I'll give you an additional minute. Thank you, Your Honor. I appreciate my friend's remarks, and I think the choice is very clear. Would the defendants in this case be free to go to the LCBO and say, we'll give you $10 million to never buy beer from Mountain Crest again? My defendant's position is yes. They can do that. Active State Doctrine gives them immunity from the Sherman Act. Paraphrasing, but I believe my friend said something to the effect of, if the conspiracy gets incorporated directly into the agreement, then the Active State Doctrine gives the perpetrators immunity. That just, it's plainly absurd, and it can't be the case. Other points about, just talking about negotiation, the law of the circuit is already from, is that if there's no compulsion, if the private party is just negotiating or going along with the government policy, in this case, of course, they were threatening an act of litigation, so it wasn't so much going along with a government policy, but the Active State Doctrine is no defense. So we could resolve this whole issue here with, they haven't argued in any way that they're compelled to do anything that's been alleged, so no Active State Doctrine defense. And they talk about, well, this is the 2015 agreement is a contract with Her Majesty. So was the Kirkpatrick contract. That was, Nigeria's a former British colony as well. That contract was with the Minister of Defense, and there was a majesty, it was all there. And it's just really striking that, even though the bribe was part of that contract, and I really encourage Your Honours to look at the respondents and the petitioner's briefs, because it's extremely similar to everything you've heard today. It's on point. These questions have been asked and answered. But it's really striking to say that, but if the bribe had been directly written into the Kirkpatrick contract, like, we will pay you this money, this is a bribe, then Kirkpatrick would have had immunity from these statutory violations. That can't be the case. So I want to thank Your Honours very much. I see I'm out of, oh, one more minute. I would like to encourage this Court to consider the Act of State Doctrine and its context and how it does not immunize parties from statutory duties. The Sherman Act imposes one set of duties, and that's the source of our damages. It's the, our damages flow from the violations. And Sizzle Sales answered that question entirely, that if there's acts done in the United States, even though they're aided by a foreign government, that it's not a bar to a Sherman Act case proceeding. Thank you very much, counsel. Thank you. Thanks to both counsel, and the case is taken under advisement.